# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALEXION PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. N22C-10-340 |
| | ) | PRW CCLD |
| v. | ) | |
| | ) | |
| ENDURANCE ASSURANCE CORPORATION f/k/a/ ENDURANCE REINSURANCE CORPORATION OF AMERICA, HUDSON INSURANCE COMPANY, NAVIGATORS INSURANCE COMPANY, and SWISS RE CORPORATE SOLUTIONS AMERICA INSURANCE CORPORATION f/k/a NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Submitted: December 7, 2023
Decided: February 15, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiff's Motion for Partial Summary Judgment,*
**GRANTED.**

*Upon Defendants Endurance Assurance Corporation, Navigators Insurance Company, and Swiss Re Corporate Solutions America Insurance Corporations's Cross-Motions for Summary Judgment,*
**DENIED.**

Daniel M. Silver, Esquire, Benjamin A. Smyth, Esquire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Robin L. Cohen, Esquire, Cynthia M. Jordano, Esquire, David J. Matulewicz-Crowley, Esquire, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York, *Attorneys for Plaintiff Alexion Pharmaceuticals, Inc.*

Marc S. Casarino, Esquire, KENNEDYS CMK LLP, Wilmington, Delaware; Jeanette L. Dixon, Esquire, MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP, New York, New York, *Attorneys for Defendant Endurance Assurance Corporation.*

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, PHILLIPS MCLAUGHLIN & HALL, Wilmington, Delaware; James Sandnes, Esquire, Sarah F. Voutyras, Esquire, SKARZYNSKI MARICK & BLACK, LLP, New York, New York, *Attorneys for Defendant Swiss Re Corporate Solutions America Insurance Corporation.*

Bruce W. McCullough, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; Ronald P. Schiller, Esquire, Thomas N. Brown, Esquire, Daniel J. Layden, Esquire, HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, Philadelphia, Pennsylvania, *Attorneys for Defendant Navigators Insurance Company.*

R. Grant Dick IV, Esquire, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Courtney E. Scott, Esquire, Tressler LLP, New York, New York, *Attorneys for Defendant Hudson Insurance Company.*

**WALLACE, J.**

This is an insurance coverage dispute. Plaintiff Alexion Pharmaceuticals, Inc. has incurred losses related to a securities action filed in federal court. It has two towers of coverage under which those losses may be covered. Defendants—the few insurers that only participated in one of the two towers—have, unsurprisingly, each pointed to that tower from which they are absent as the proper source of coverage. Now, Plaintiff and three Defendants have cross-moved for summary judgment as to whether the federal securities action is "related" to a previously reported incident. The answer will dictate the proper placement of that claim.

The federal securities action is not related to a previous claim. Based on the language of the policy and Delaware law, the applicable standard for relatedness is whether the two incidents are "meaningfully linked." Here, the link between the securities action and the prior incident is tangential, not meaningful. Accordingly, Plaintiff's Motion is **GRANTED** and Defendants' Motions are **DENIED**.

## I. FACTUAL BACKGROUND

### A. THE PARTIES

Plaintiff Alexion Pharmaceuticals, Inc. is a Delaware corporation.[1] Alexion developed a drug called Soliris that's used to treat certain rare diseases.[2] Alexion has been accused of wrongdoing in its promotion of Soliris that led to corporate

---

[1] Complaint ("Compl.") ¶ 16 (D.I. 1).

[2] Alexion's Motion for Partial Summary Judgment (hereinafter "Alexion's Mot."), Ex. 13 (hereinafter "Securities Action Am. Compl.") ¶ 7 (D.I. 17).

losses.[3]

Defendant Endurance Assurance Corporation f/k/a Endurance Reinsurance Corporation of America is a Delaware corporation.[4] Endurance was the third-level excess insurer in Alexion's tower of insurance from 2015 to 2017.[5]

Defendant Navigators Insurance Company is a New York corporation.[6] Navigators was the ninth-level excess insurer in Alexion's 2015 to 2017 insurance program.[7]

Defendant Swiss Re Corporate Solutions America Insurance Company f/k/a North American Specialty Insurance Company is a Missouri corporation.[8] Swiss Re was the second-level excess insurer in Alexion's 2015 to 2017 insurance program.[9]

Defendant Hudson Insurance Company is a Delaware corporation.[10] Hudson was the third-level excess insurer in Alexion's tower of insurance from 2014 to 2015.[11]

---

[3] *See, e.g.*, Securities Action Am. Compl.

[4] Compl. ¶ 17.

[5] Alexion's Mot., Ex. 1 (hereinafter "Alexion's D&O Insurance Coverage").

[6] Compl. ¶ 19.

[7] *See* Alexion's D&O Insurance Coverage.

[8] Compl. ¶ 20.

[9] *See* Alexion's D&O Insurance Coverage.

[10] Compl. ¶ 18.

[11] *See* Alexion's D&O Insurance Coverage.

## B. ALEXION'S PROMOTION OF SOLIRIS AND RELATED LOSSES

### 1. SOLIRIS'S MARKETING

Alexion's product, Soliris, is not a typical medicine. It belongs to a family of so-called "orphan drugs."[12] Orphan drugs are marked by their rarity, as they treat the world's least common diseases.[13] Soliris, for example, treats paroxysmal nocturnal hemoglobinuria and atypical hemolytic uremic syndrome.[14] In 2017, Soliris only had about 11,000 customers.[15] For those users, Soliris could be "a miracle drug."[16] But miracles don't come cheap. Soliris's annual cost per patient reportedly ranged between $500,000 and $700,000.[17]

With such high per-customer revenue, customers were naturally in high demand.[18] To find and bind its uncommon customers, Alexion allegedly relied upon extreme sales tactics.[19] Those alleged efforts include, for example, improperly obtaining patient data to locate potential customers, telling potential customers

---

[12] Navigators and Swiss Re's Brief Opposing Alexion's Motion for Partial Summary Judgment (hereinafter "Navigators and Swiss Re's Opp'n Br."), Ex. B (hereinafter "Bloomberg Article") at 2 (D.I. 58).

[13] Bloomberg Article at 2.

[14] *Id.* at 6.

[15] *Id.* at 3.

[16] *Id.* at 7.

[17] *Id.* at 2.

[18] *Id.* at 7.

[19] Securities Action Am. Compl. ¶ 3.

"you're going to die" to encourage them to demand Soliris from their doctor, pressuring doctors to provide Soliris even when the doctor didn't believe it was an appropriate treatment, and funneling money through charitable organizations to help patients obtain subsidized Soliris prescriptions.[20]  Relevant here, Soliris also allegedly funded foreign patient advocacy groups' efforts to obtain government funding for Soliris prescriptions.[21]

### 2. THE SEC SUBPOENA AND SETTLEMENT

Alexion's legal problems first arrived on May 7, 2015, in the form of a subpoena from the Securities and Exchange Commission (the "SEC Subpoena").[22] The SEC Subpoena was broad in scope, but primarily sought documents related to Alexion's foreign and domestic grantmaking activities, with an emphasis on Alexion's compliance with the Foreign Corrupt Practices Act (the "FCPA").[23]  The SEC Subpoena also requested any documents related to recalls of Soliris.[24]

An earlier SEC document—which ordered the investigation into Alexion— was dated March 9, 2015, and outlined the SEC's early theories (the "March 9

---

[20]  *Id.* ¶¶ 15, 16, 18, 19.

[21]  *Id.* ¶ 157.

[22]  *See* Alexion's Mot., Ex. 11 (hereinafter "SEC Subpoena").

[23]  SEC Subpoena at ALXN000011 to ALXN000016.

[24]  *Id.* at ALXN000012 to ALXN000013.

Order").[25]  That preliminary document raised the possibility of Alexion including inaccurate information on its annual and quarterly reports, failing to keep adequate books and records, and "failing to implement a system of internal accounting controls."[26]  Like the subpoena it spurred, the most specific allegations in the March 9 Order relate to Alexion's "payment of bribes to foreign officials . . . and the level of recall required for Alexion's drug, Soliris, the impacts on Alexion's revenue streams, and the risk to investors."[27]

In July 2020, Alexion settled with the SEC.[28]  In its summary of findings, the SEC said, "[t]hese proceedings arise out of Alexion's violations of the internal accounting controls and recordkeeping provisions of the Foreign Corrupt Practices Act of 1977."[29]  The SEC found that from 2011 to 2015, Alexion's subsidiaries in Turkey and Russia made improper payments to government officials to obtain beneficial treatment of Soliris.[30]  The SEC further found that those Alexion subsidiaries kept false records in connection with those payments and that Alexion's internal accounting controls weren't sufficient to catch its subsidiaries'

---

[25]  Alexion's Supplemental Brief in Support of its Motion for Summary Judgment (hereinafter "Alexion's Supp. Br."), Ex. 30 (D.I. 122).

[26]  Alexion's Supp. Br., Ex. 30 at Alexion_001731 to Alexion_001733.

[27]  *Id.* at Alexion_001731.

[28]  *See* Navigators and Swiss Re's Opp'n Br., Ex. H ("hereinafter "SEC Settlement").

[29]  SEC Settlement at 2.

[30]  *Id.*

wrongdoing.[31] Similarly, the SEC found that Alexion's deficient internal accounting controls led to Alexion's subsidiaries in Brazil and Colombia failing "to maintain accurate books and records regarding third-party payments."[32] Alexion agreed to remedy its noncompliance and pay over $21 million in penalties.[33]

### 3. THE DISTRICT OF CONNECTICUT SECURITIES ACTION

Alexion's legal troubles deepened on December 29, 2016, when a class of Alexion stockholders commenced a federal securities lawsuit in the District of Connecticut (the "Securities Action"). On June 2, 2019, the plaintiffs in the Securities Action filed an Amended Consolidated Class Action Complaint (the "Securities Action Amended Complaint") against Alexion and its officers and directors for violation of federal securities laws.[34]

The Securities Action Amended Complaint's allegations have three general themes: (1) Alexion and its officers and directors misled investors about the source of Alexion's financial success; (2) Alexion's sales practices violated applicable industry ethical standards and federal law; and (3) the "truth" about Alexion's illegal and unethical sales practices was slowly revealed through a series of "partial

---

[31] *Id.*

[32] *Id.* As relevant here, the SEC found that "[f]rom 2013 to 2015, certain employees at Alexion Brazil and Alexion Colombia created or directed third parties to create inaccurate financial records concerning payments to third parties, including patient advocacy organizations." *Id.* at 6.

[33] *Id.* at 8.

[34] *See* Securities Action Am. Compl.

disclosures."[35] The plaintiffs asserted causes of action under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5.[36] In sum, the Securities Action plaintiffs complain that they overpaid for stock that was propped up by illegal activity.

Relevant here, the Securities Action plaintiffs used Alexion's activities in Brazil as one example of Alexion's undisclosed wrongdoing.[37] Specifically, Alexion allegedly used its relationship with a patient advocacy group called Associacao dos Familiares, Amigos e Portadores de Doenças Graves ("AFAG") to manipulate Brazil's pharmaceutical reimbursement policies.[38] That alleged scheme takes advantage of Brazil's constitutional guarantee of healthcare for its citizens.[39] Pharmaceutical companies are supposed to register their products with the Brazilian government, so that the government can negotiate on price.[40] But citizens can get reimbursed for unregistered medications by suing the government.[41] Alexion chose not to register Soliris and, instead, used AFAG to fund citizens' suits demanding

---

[35] *Id.* ¶¶ 7-25.

[36] *Id.* ¶¶ 365-78.

[37] *Id.* ¶¶ 155-62.

[38] *Id.* ¶ 155.

[39] *Id.* ¶ 156.

[40] *Id.*

[41] *Id.*

reimbursement of Soliris at full price.[42]  In doing so, Alexion both circumvented Brazil's price negotiation requirement and allegedly pushed through fraudulent claims.[43]  Through that ploy, Alexion reportedly plundered about $400 million from the Brazilian government.[44]

## C. ALEXION'S INSURANCE PROGRAMS

Seeking coverage for the Securities Action, Alexion turned to two potential towers of Directors' and Officers' Liability ("D&O") insurance: the "2014-2015 Program" and the "2015-2017 Program."[45]  These two towers are largely the same, narrowing the parties to this dispute.  But, for Endurance, Swiss Re, Navigators (together, the "2015-2017 Insurers"), and Hudson, their liability depends on the placement of the Securities Action.  The answer to that placement question, in turn, hinges on whether the Securities Action is related to the SEC Subpoena.

### 1. THE 2014-2015 PROGRAM

Alexion purchased a claims-made D&O insurance program for the period of June 27, 2014, to June 27, 2015 (the "2014-2015 Program").[46]  The primary policy was issued by non-party ACE American Insurance Company ("Chubb") and covered

---

[42]  *Id.* ¶¶ 157-59.

[43]  *Id.* ¶ 160.

[44]  *Id.* ¶ 161.

[45]  *See* Alexion's D&O Insurance Coverage.

[46]  *See id*.

Alexion as well as Alexion's Officers and Directors (the "2014-2015 Policy").[47] The 2014-2015 Program included a series of excess policies that followed form to the 2014-2015 Policy.[48] The only insurer from the 2014-2015 Program that is presently a party here is Hudson; Hudson was the 2014-2015 third-level excess insurer.[49] The details of the 2014-2015 Policy aren't of much importance in resolving these cross-motions.

## 2. THE 2015-2017 PROGRAM

Alexion purchased a similar insurance program for the period of June 27, 2015, to June 27, 2017 (the "2015-2017 Program").[50] Like the 2014-2015 Program, Chubb issued the primary policy (the "2015-2017 Policy"),[51] and the excess policies followed form. The line of excess insurers is nearly identical to the 2014-2015 Program. But, in this later period, Swiss Re, Endurance, and Navigators were the second-level, third-level, and ninth-level excess insurers, respectively.[52] Several provisions of the 2015-2017 Policy, which are incorporated into the excess policies, form the basis of these 2015-2017 Insurers' denials of coverage.

---

[47]  *See* Alexion's Mot., Ex. 8 (hereinafter "2014-2015 Policy").

[48]  *See* Alexion's D&O Insurance Coverage.

[49]  *Id.* Old Republic Insurance Company was named a defendant in this action but has since settled with Alexion. *See* Order of Dismissal with Prejudice as to Claims Against Old Republic Insurance Company (D.I. 118).

[50]  *See* Alexion's D&O Insurance Coverage.

[51]  *See* Alexion's Mot., Ex. 3 (hereinafter "2015-2017 Policy").

[52]  Alexion's D&O Insurance Coverage.

First, Section VII of the 2015-2017 Policy states in relevant part that:

> All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**. All **Loss** resulting from a single **Claim** shall be deemed a single **Loss**.[53]

Under the 2015-2017 Program, "**Wrongful Act**" means:

> [A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty, . . . actually or allegedly committed or attempted by: 1. . . . any **Insured Person** in his or her status as such, or any matter claimed against any **Insured Person** solely by reason of his or her serving in such capacity; 2. . . . the **Company**, but solely with respect to a **Securities Claim**.[54]

"**Interrelated Wrongful Acts**" are defined as: "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes."[55]

Next, the "Prior Notice Exclusion" states:

> **Insurer** shall not be liable for **Loss** on account of any **Claim**: . . . J. alleging, based upon, arising out of, or attributable to any **Wrongful Act**, fact, or circumstance which has been the subject of any written notice given and accepted under any other directors & officers policy of which this **Policy** is a renewal or replacement.[56]

---

[53] 2015-2017 Policy § VII.A.

[54] *Id.* § End. 13 (replacing the definition of "Wrongful Act" in § II.Q).

[55] *Id.* § II.H.

[56] *Id.* § End. 9 (replacing the "Prior Notice Exclusion" in § III.J).

**D. ALEXION'S NOTICES TO ITS INSURERS AND THE INSURERS' RESPONSES**

Alexion's first relevant contact with its insurers came on June 18, 2015, when it reported the SEC Subpoena to Chubb via a "Notice of Circumstances."[57] Chubb responded on June 30, 2015, saying it did not consider Alexion's June 18 communication to be a "Claim" and that Alexion would need to submit additional notice if "an actual Claim, as defined by Section II of the Policy, arises from this matter."[58]

Turning to the Securities Action, Alexion first provided notice to its insurers on January 5, 2017.[59] Thereafter, Alexion's insurers took differing positions. On February 20, 2017, Chubb accepted coverage of the Securities Action under the 2015-2017 Program, expressly reserving its rights.[60] Then, in October 2018, Chubb reversed course and told Alexion the Securities Action arose from "Wrongful Acts" or "Interrelated Wrongful Acts" reported during the 2014-2015 policy period.[61] So, Chubb's new position was that the Securities Action, among other actions, was a single "Claim" first made in the 2014-2015 policy period.[62] In other words, Chubb

---

[57] *See* Alexion's Mot., Ex. 12 at 1.

[58] *Id.* at 2.

[59] *See* Alexion's Mot., Ex. 14 at 1.

[60] *See generally id.*

[61] Alexion's Mot., Ex. 15 at 3.

[62] *Id.*

- 11 -

ultimately decided the Securities Action was related to the SEC Subpoena.

Swiss Re, Navigators, and Endurance all held the position that there was no coverage for the Securities Action under the 2015-2017 Program—*i.e.*, the program they were a part of.[63] Hudson, which only participated in the 2014-2015 Program, said the Securities Action did "not sufficiently overlap" with the SEC Subpoena and so it was not covered under the 2014-2015 Program.[64]

### E. THIS LITIGATION

Alexion initiated this action against Endurance, Hudson, Navigators, Old Republic, and Swiss Re.[65] Alexion asserted three causes of action: (1) breach of contract under the 2015-2017 Program against Swiss Re, Endurance, and Navigators; (2) a request for a declaration under the 2015-2017 Program that the Securities Action is a "Claim" first made in the 2015-2017 policy period such that the 2015-2017 excess policies apply to the Securities Action; and (3) an alternative prayer for a declaration that the Securities Action is a "Claim" first made under the 2014-2015 Program such that the 2014-2015 excess policies apply to the Securities Action.[66]

Alexion immediately moved for summary judgment on "relatedness," arguing

---

[63] Alexion's Mot., Exs. 16-18.

[64] Alexion's Mot., Ex. 20 at 14.

[65] *See* Compl.

[66] *Id.* ¶¶ 87-116.

- 12 -

the SEC Subpoena and the Securities Action are not related as a matter of law.[67] Endurance cross-moved for summary judgment seeking an opposite determination.[68] Swiss Re and Navigators jointly opposed Alexion's Motion and sought additional discovery into the details of the SEC investigation under Superior Court Civil Rule 56(f).[69] Hudson opposed Alexion's Motion only to the extent that Alexion alternatively argued the Securities Action is covered under the 2014-2015 Program.[70] In the face of all this, the Court partially granted Swiss Re and Navigators's discovery request and stayed the pending cross-motions.[71]

Old Republic—which hadn't opposed Alexion's Motion—successfully reached an accord with Alexion. So the claims against it have been dismissed.[72] Meanwhile, the other parties wrapped up the compelled discovery and embarked on a new round of arguments. Swiss Re and Navigators, still acting in unison, followed Endurance's lead and filed a Cross-Motion for Summary Judgment.[73] The same day,

---

[67] *See* Alexion's Mot.

[68] *See* Endurance's Cross-Motion for Summary Judgment (hereinafter "Endurance Mot.") (D.I. 59).

[69] *See* Navigators and Swiss Re's Opp'n Br.

[70] *See* Hudson's Brief Opposing Alexion's Motion for Summary Judgment (hereinafter "Hudson's Opp'n Br.") (D.I. 60).

[71] May 25, 2023 Judicial Action Form (D.I. 95).

[72] D.I. 118.

[73] *See* Swiss Re and Navigators's Supplemental Brief in Opposition to Alexion's Motion for Summary Judgment and in Support of their Cross-Motion for Summary Judgment (hereinafter "Navigators and Swiss Re's Supp. Br.") (D.I. 121).

Endurance and Alexion filed supplemental briefs, augmenting their previous positions with the new discovery.[74] The dueling summary judgment motions are now ready for decision.

## II.  THE PARTIES' CONTENTIONS

### A. ALEXION'S MOTION

Alexion maintains it is entitled to summary judgment on the issue of "relatedness."  According to Alexion, the Securities Action is covered under the 2015-2017 Program, not the 2014-2015 Program, because the Securities Action is not so related to the SEC Subpoena that the two should be considered one Claim.[75] Specifically, Alexion argues the Securities Action doesn't share the requisite "nexus" with the SEC Subpoena in light of Delaware cases construing similar insurance policies.[76]  Alexion says coverage under the 2015-2017 Policy would be illusory if the 2015-2017 Insurers' contrary interpretation is adopted.[77]  In the alternative, Alexion asks the Court to find and declare the Securities Action is covered under the 2014-2015 Program.[78]

---

[74]  *See* Alexion's Supp. Br.; Endurance's Supplemental Brief in Support of its Cross-Motion for Summary Judgment (hereinafter "Endurance's Supp. Br.") (D.I. 119).

[75]  *See* Alexion's Mot. at 20-25.

[76]  *See id.*

[77]  *See id.* at 29-30.

[78]  *See id.* at 30-31.

### B. THE 2015-2017 INSURERS' CROSS-MOTIONS

The 2015-2017 Insurers take the opposite view. Their cross-motions seek a determination that the Securities Action is related to the SEC Subpoena and, therefore, isn't covered by the 2015-2017 Program.[79] All of the 2015-2017 Insurers argue that coverage is excluded by the 2015-2017 Policy's Prior Notice Exclusion found in Section III.J thereof.[80] Endurance additionally argues that the Securities Action is a Claim first made under the 2014-2015 Program because the bases of the SEC Subpoena and the Securities Action are "Interrelated Wrongful Acts."[81] Endurance points to Section VII.A of the 2015-2017 Policy, which states that Claims arising from Interrelated Wrongful Acts constitute a single Claim first made at the time of the earliest Claim.[82]

### C. HUDSON'S OPPOSITION

Hudson, the lone 2014-2015 insurer left in this case, takes a mixed position with regard to Alexion's Motion. It agrees with Alexion that the Securities Action does not relate to the SEC Subpoena such that the Securities Action should be covered under the 2014-2015 Program.[83] Hudson only opposes Alexion's claim to

---

[79] *See* Endurance's Mot. at 2-3; Navigators and Swiss Re's Supp. Br. at 5-6.

[80] Endurance's Mot. at 15-23; Navigators and Swiss Re's Opp'n Br. at 15-23; Navigators and Swiss Re's Supp. Br. at 5-6.

[81] Endurance's Mot. at 23-26.

[82] *See id.* (citing 2015-2017 Policy § VII.A).

[83] Hudson's Opp'n Br. at 10-11.

coverage under the 2014-2015 if the Securities Action is placed there.[84]  And,  insists Hudson, it has certain defenses to coverage that Alexion has not addressed.[85]  So, Hudson says, summary judgment on the ultimate question of its coverage liability as a 2014-2015 insurer can't be granted.[86]

### III.  APPLICABLE LEGAL STANDARD

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[87]  The movant bears the initial burden of proving its motion is supported by undisputed facts.[88]  If the movant meets its burden, the non-movant must show there is a "genuine issue for trial."[89]  To determine whether a genuine issue exists, the Court construes the facts in the light most favorable to the non-movant.[90]

The "Court may not be able to grant summary judgment 'if the factual record

---

[84]  *Id.* at 11-13.

[85]  *Id.* at 12.

[86]  *Id.* at 11-13.

[87]  Del. Super. Ct. Civ. R. 56(c); *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021).

[88]  *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[89]  Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.").

[90]  *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

has not been developed thoroughly enough to allow the Court to apply the law to the factual record.'"[91] But "[i]f the Court finds that no genuine issues of material fact exists, and the moving party has demonstrated [its] entitlement to judgment as a matter of law, then summary judgment is appropriate."[92]

"These well-established standards and rules apply in full when the parties have filed cross-motions for summary judgment."[93] Filing cross-motions for summary judgment "does not act *per se* as a concession that" there are no genuine factual disputes.[94] "But, where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the[m].'"[95]

[91] *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020) (quoting *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015)).

[92] *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996) (citing *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. Ct. 1973)); *see also Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999) ("However, a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary." (citing *Mitchell v. Wolcott*, 83 A.2d 759, 761 (Del. 1951))).

[93] *Radulski*, 2020 WL 8676027, at *4 n.35 (collecting cases); *see also Sarraf 2018 Fam. Tr. v. RP Holdco, LLC*, 2022 WL 10093538, at *5 (Del. Super. Ct. Oct. 17, 2022); *Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2023 WL 615997, at *8 (Del. Super. Ct. Jan. 23, 2023).

[94] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[95] *Radulski*, 2020 WL 8676027, at *4 (alteration in original) (quoting Del. Super. Ct. Civ. R. 56(h)).

## IV. DISCUSSION

Under Delaware law, "the principles of insurance contract interpretation are well-established and are grounded in the parties' intent, as expressed through their contractual language."[96] The Court must analyze "unambiguous insurance policies according to their ordinary meaning."[97] If an insurance contract's language is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[98] Disagreement about a policy's meaning does not itself create ambiguity.[99] Instead, a contract is only ambiguous when its relevant provisions are "reasonably or fairly susceptible" to "different interpretations."[100]

"Insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations."[101] And generally, the insured's burden is to show that a claim falls within the contract's coverage scope, while the insurer's burden "is to establish that a claim is specifically excluded."[102] Courts interpret such exclusionary clauses with "a strict and narrow construction and give

---

[96] *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *10 (Del. Super. Ct. Sept. 10, 2021) (citing *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905-06 (Del. 2021)); *see also Options Clearing Corp.*, 2021 WL 5577251, at *7.

[97] *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *11 (citing *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1131 (Del. 2020)).

[98] *RSUI Indem. Co.*, 248 A.3d at 905 (internal quotation marks and citation omitted).

[99] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[100] *Id.* (citation omitted).

[101] *RSUI Indem. Co.*, 248 A.3d at 906 (citation omitted).

[102] *Id.* (internal quotation marks and citation omitted).

effect to such exclusionary language only where it is found to be specific, clear, plain, conspicuous, and not contrary to public policy."[103]

## A. BOTH THE PRIOR NOTICE EXCLUSION AND THE DEFINITION OF INTERRELATED WRONGFUL ACTS REQUIRE A MEANINGFUL LINKAGE.

The first step in resolving these cross-motions is determining the standard by which relatedness must be measured. Relatedness inquiries are not governed by a single "generic" standard.[104] Rather, like all contract questions, the answer "is prescribed by the language of the policy."[105] Nevertheless, insurers are creatures of habit, and certain phrases tend to recur. The at-issue provisions here are no exception.

The key phrase in the Prior Notice Exclusion is "<u>alleging, based upon, arising out of, or attributable to</u> any **Wrongful Act**, fact, or circumstance which has been the subject of any written notice given and accepted under [a previous D&O policy]."[106] And, stitching together the definition of "Interrelated Wrongful Act" and the limitation in Section VII.A, the key phrase there is "<u>arising out of</u>" "all **Wrongful Acts** <u>that have as a common nexus</u> any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events,

---

[103] *Id.* (cleaned up) (citation omitted).

[104] *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 274 A.3d 1006, 1013 (Del. 2022).

[105] *Id.* (internal quotation marks and citation omitted).

[106] 2015-2017 Policy §§ End. 9, III.J (emphasis added).

transactions or causes."[107]

This Court has seen nearly identical language before. For example, in *Options Clearing Corporation v. U.S. Specialty Insurance Company*, this Court interpreted a "Prior Notice Exclusion" that barred coverage for claims "'arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained' in any Claim that already has been reported."[108] Just weeks before, the Court had interpreted an "Interrelated Claims Provision" that limited coverage for claims that "'arise out of,' 'result from,' 'are in consequence of,' or 'in any way involve,' 'the same or related . . . facts, circumstances, situations, transactions or events.'"[109] In both instances, the Court reached the same conclusion about the applicable standard for relatedness: "meaningful linkage."[110]

That same standard is used here. The meaningful linkage standard's applicability to the Prior Notice Exclusion is obvious. The language of that exclusion is almost word-for-word the at-issue language in *Options Clearing*. Applying the same standard to the definition of Interrelated Wrongful Acts requires just a bit more analysis.

---

[107] *Id.* §§ VII.A, II.H (emphasis added).

[108] 2021 WL 5577251, at *8.

[109] *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *11 (omission in original).

[110] *Options Clearing Corp.*, 2021 WL 5577251, at *8-9; *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *12.

As a starting point, Section VII.A's limitation applies only to Claims "arising out of" Interrelated Wrongful Acts. So, Section VII.A's plain language itself suggests a meaningful link is required to trigger the limitation.[111] The definition of Interrelated Wrongful Acts adds the notion of a "common nexus." But that phrase has a similar meaning in this context.

In *Pfizer Inc. v. Arch Insurance Company*, this Court looked at a "definition of 'Interrelated Wrongful Acts'" that—like the one here—meant "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."[112] *Pfizer* explicitly cautioned against interpreting that language to mean "shar[ing] 'any' commonality" suffices to make two claims related.[113]

In *Sycamore Partners*, this Court described the "common nexus standard" as requiring that claims "share material facts."[114] There is little practical difference

---

[111] *See Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 ("[U]nder Delaware law, the term 'arising out of' is broadly construed to require some meaningful linkage . . . .").

[112] 2019 WL 3306043, at *5 (Del. Super. Ct. July 23, 2019) (emphasis omitted), *abrogated by*, *First Solar, Inc.*, 274 A.3d at 1013. *Pfizer* was abrogated by *First Solar* to the extent it relied on the "fundamentally identical" standard for relatedness.

[113] *Id.* at *9 ("This reading is strained, uncharacteristically broad, and runs afoul of this Court's prior interpretation standards set forth in previous cases.").

[114] *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *10.

between two claims having a meaningful link and sharing material facts.[115]  Indeed, *Sycamore Partners* outlined an expansive list of phrases that define relatedness— including the particularly broad phrases "flowing from" and "in any way involv[ing]"—that have all been held to implicate the meaningful link standard.[116] And the parties here have offered no textual basis to depart from that approach.  So the Court will apply the meaningful linkage now.

### B.  THE SEC SUBPOENA AND THE SECURITIES ACTION AREN'T  MEANINGFULLY LINKED.

With it established that a meaningful linkage is required to bar coverage under either Section VII.A or Section III.J of the 2015-2017 Policy, the remaining question is whether such a link exists between the SEC Subpoena and the Securities Action. It does not.

Our Supreme Court recently addressed the meaningful linkage standard in the context of a professional services exclusion in a management liability policy.[117]  The insured in that case, Guaranteed Rate, was penalized for violations of the False Claims Act because it falsely underwrote federally insured loans that were ineligible

---

[115]  The key word here is "material."  Sharing "background facts in common" is not a meaningful linkage, nor are background facts material. *Id.* at \*14; *see also MidFirst Bank v. Mullane*, 2023 WL 8926867, at \*2 (Del. Super. Ct. Dec. 26, 2023) (explaining material facts are those "that might affect the outcome of the suit" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968))).

[116]  *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at \*12 (collecting cases).

[117]  *ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*, 305 A.3d 339 (Del. 2023).

for government backing.[118]  The insurer claimed those violations arose out of Guaranteed Rate's professional services—*i.e.*, underwriting loans—and were thus excluded under the management liability policy.[119]  Not so, said the Court.

The Supreme Court explained that the "linkage must be meaningful, not tangential."[120]  It concluded that although there may have been some causal connection between the underwriting and false certifications "[i]n a technical sense," "a meaningful linkage is absent given the difference between the subject of the FCA claims—false certifications—and the underlying conduct used to demonstrate the falsity of the claims—underwriting loans."[121]  The Court reasoned that interpreting the professional services exclusion to include "incidental" connections with professional services would render the exclusion unduly broad.[122]

In contrast, the Supreme Court found a meaningful linkage in *Eon Labs Manufacturing, Inc. v. Reliance Insurance Company*.[123]  There, the relevant policy excluded coverage for third-party bodily injury claims "arising out of [the insured's] products."[124]  The insured faced liability for harms that resulted from users

---

[118]  *Id.* at 341.

[119]  *Id.* at 343-44.

[120]  *Id.* at 349.

[121]  *Id.* at 347-48.

[122]  *Id.* at 348.

[123]  756 A.2d 889 (Del. 2000).

[124]  *Id.* at 891.

combining its drug with other drugs.[125]  The Court found a meaningful linkage between the insured's product and the bodily injury claims because "the basis" of the bodily injury suits was "the involvement or presence of [the insured's drug.]"[126]

In *Options Clearing*, this Court clarified that when looking for a meaningful link, "it is not enough for two claims to mention some of the same facts."[127]  There, the insured had initially faced SEC scrutiny based on "several points where [the insured]'s documentation and practices were not in compliance with securities laws and regulations or otherwise were insufficient."[128]  A D&O policy issued after that SEC intervention barred coverage for the insured's "ongoing noncompliance and violations of the securities laws reflected in the SEC's findings."[129]  Thereafter, the insured faced new enforcement actions by the SEC and the Commodity Futures Trading Commission.[130]  Applying the meaningful linkage standard, this Court concluded the actions were not related because they (1) involved different types of investigations; (2) occurred in different time periods; (3) involved different regulations; (4) sought different relief; and (5) "[p]erhaps most significantly, . . .

[125]  *Id.* at 890.

[126]  *Id.* at 893.

[127]  2021 WL 5577251, at *8 (citing *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *14).

[128]  *Id.* at *3.

[129]  *Id.*

[130]  *Id.* at *4-5.

differ[ed] in the type of wrongful conduct that is alleged."[131]

Similarly, our Supreme Court in *First Solar* considered whether two actions were related and evaluated: (1) the parties; (2) the relevant time period; (3) the overall theory of liability; (4) a sampling of relevant evidence; and (5) the claimed damages.[132] The Court applied those factors and found the two *First Solar* actions were "substantially similar and fundamentally identical."[133]

Guided by those examples, the Court is convinced that the SEC Subpoena and Securities Action are not meaningfully linked. The SEC Subpoena and Securities Action are only loosely connected by Alexion's activities in Brazil. And that tangential link is not enough to make the two related for purposes of the 2015-2017 Policy.

The SEC Subpoena was broadly concerned with Alexion's compliance with the FCPA.[134] And, while Brazil was specifically referenced in the SEC Subpoena, so too were Japan, Turkey, and Russia.[135] Indeed, the SEC's eventual findings focused on conduct related to Turkey and Russia, and only briefly mentioned Alexion's conduct in Brazil.[136] The SEC's findings only charged Alexion with

---

[131] *Id.* at *9.

[132] *First Solar, Inc.*, 274 A.3d at 1014.

[133] *Id.* at 1016.

[134] SEC Subpoena at ALXN000011 to ALXN000016.

[135] *Id.* at ALXN000013.

[136] *See* SEC Settlement at 3-6.

failing to keep adequate books and records and not maintaining "sufficient internal accounting controls over the payments to foreign officials and third parties."[137] That is wholly different from the conduct alleged in the Securities Action.

The Securities Action plaintiffs argued that Alexion and its directors artificially inflated Alexion's value through an array of misdeeds.[138] Of the wrongful conduct alleged in the Securities Action, Alexion's activity in Brazil is but a small part. The "fraudulent scheme" alleged in the Security Action Amended Complaint spans more than sixty paragraphs.[139] Only nine of those paragraphs mention foreign contributions.[140] And unlike the SEC Subpoena—which was focused on the propriety of the contributions and the reporting thereof—the Securities Action is only concerned with the use to which the contributions were put.[141] In other words, the Securities Action plaintiffs don't complain that Alexion improperly made payments to AFAG, they complain that AFAG used those payments to defraud the Brazilian government and falsely inflate Alexion's stock price.

The Court recognizes that the Securities Action plaintiffs considered the SEC's findings that resulted from the SEC Subpoena to be useful evidence in their

---

[137] *Id.* at 7.

[138] Securities Action Am. Compl. ¶¶ 7-25.

[139] *Id.* ¶¶ 102-67.

[140] *Id.* ¶¶ 105, 155-62.

[141] *Id.* ¶¶ 155-62.

case.[142]  But that's of little moment.  First, it is unremarkable that ably represented litigants would portray any available evidence as favorable to them.  More importantly, the Securities Action plaintiffs did not argue that the SEC's findings directly proved any of their allegations.  Instead, they said that the SEC's findings helped to "demonstrate[] a sustained pattern of illegal and unethical conduct in the sales and marketing of Soliris, which adds to the already strong inference of scienter against Defendants."[143]  Though accusations of general wrongdoing may lend support to the sweeping allegations in the Securities Action, such abstract notions are not helpful to a relatedness analysis.[144]

## V. CONCLUSION

At bottom, the factual connection between the SEC Subpoena and the Securities Action is insufficient to make them related.  They have different parties; focus on overlapping, but not identical, time periods; raise entirely different theories of liability; rely on different evidence; and seek different relief.  Accordingly, the supposed "nexus" of Alexion's conduct in Brazil is too insubstantial to make the two related for purposes of the 2015-2017 Policy.

---

[142] *See* Navigators and Swiss Re's Supp. Br., Ex. BB.

[143] *See id.* at 2.

[144] *See AmTrust Fin. Servs., Inc. v. Liberty Ins. Underwriters Inc.*, 2022 WL 980299, at \*5 (D. Del. Mar. 31, 2022) (explaining that characterizing conduct at "a high level of abstraction" for purposes of relatedness can lead to illusory coverage).

Alexion's Motion for Partial Summary Judgment on its first two counts is **GRANTED** and the 2015-2017 Insurers' Motions for Summary Judgment are **DENIED**. The at-issue claim is properly placed in the 2015-2017 coverage tower.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

Original to Prothonotary

cc: All Counsel via File and Serve